Good morning, your honors. My name is Lisa Tabari, and I am one of the defendants. If it pleases the court, I would like to try to reserve two minutes at the end for rebuttal, if possible. And in an effort... Look at the clock, the numbers in front of you. Okay. Whatever you've got left over when you sit down is yours. Okay, thank you. In an effort to maximize my time, I understand that we only have ten minutes, I'm going to try to read off what I prepared. That is approximately four minutes, and then leave the rest for any questions that you guys may have. So, thank you for being patient with me, I apologize. It's quite okay, just relax. Thank you. First, we feel what renders this case so unique and ultimately determines that confusion was not likely is the mere fact that Fast Imports does not sell Lexus vehicles or compete with Toyota Motor Sales. In fact, Fast Imports advertises on behalf of Toyota Motor Sales, refers the consumer to the franchise Lexus dealer, and then receives an advertising fee from them for that referral. The advertising is truthful, the services are complimentary, the consumer should not be confused, and ultimately both the consumer and Toyota benefit from Fast Imports' fair use of the domain name, buyerlesslexus.com. Second, it's my understanding that the Supreme Court case in KP Permanent Makeup v. Lasting Impressions was clearly against the notion that a fair use defense shifts the burden onto the defendant of proving no likelihood of confusion. They held that the statutory language regarding fair use was clear, and there was no fourth element that says a court must also find a lack of likelihood of confusion. The foundation of trademark infringement and unfair competition being consumer protection and the question whether or not the consumer is harmed by Fast Imports' use of the domain name appears that the question is the likelihood of confusion and the burden solely on the plaintiff. And it looks like we have to look at the sleek crap factors to make that determination. However, I think that that is where the confusion lies and possibly the controversy begins, is how does one appropriately weigh the sleek crap factors in a case asserting a nominative fair use. I thought you said that the sleek crap factors don't apply in nominative fair use cases. I mean, do you concede? Do you really want to concede that sleek crap applies? Excuse me. Hold the clock. Do we know what that noise was? Well, let's hope it doesn't come back. If it comes back, stop the clock and let's call somebody. I thought it was your position. I would have thought it was your position that the sleek crap factors don't apply because we set some cams. Okay. By the name of CARNS, C-A-R-N-S. We said, what did we say in CAMS? Let me see. This is on page 292, Fed 3rd, page 1150. It seems to say that the sleek crap factors don't apply. Doesn't it? This is on the right hand side. Contrast the sleek crap factors in a nominative fair use case. So do you really have to deal with sleek crap? Well, if you look at the Third Circuit case, the Century 21 case versus Lending Tree, they stated in the context of non-interfair use of a mark that certain sleek crap factors are either unworkable or not suited as indicators of confusion, and if applied mechanically, would inevitably point towards a likelihood of confusion where no likelihood of confusion existed. And that's where we feel that the district court erred. They focused on, she focused on the internet trinity and the skew sleek crap factors in favor of Toyota. And again, when they addressed their lap factors, being the strength of the mark, the proximity of the goods, the likelihood of expansion, in the Century 21 case, they felt that those factors were irrelevant or had no bearing in a nominative fair use case. What the court did look at was the remaining factors that weigh against a likelihood of confusion, which were the evidence of actual confusion, the types of good and the degree of care likely to be exercised by the consumer, and the defendant's intent. And all three of those factors weighed in our favor in this case, Your Honors. But you have a district court finding of confusion, right? I'm sorry? You have a district court finding of likelihood of confusion. Based upon the initial interest. No, no. Sorry. We agree on that. You have a finding by the district court of likelihood of confusion. Correct. And your argument is the district court is just wrong on that, as a matter of fact? Or that the district court applied the wrong legal analysis? Applying the wrong legal analysis. Okay. What analysis should the district court have applied, in your view? Well, in KP Permanent Makeup, the Supreme Court felt that the Ninth Circuit's view of fair use might have been contrary to the plain meaning of the statute, stating that those that say there cannot be a fair use if there's a confusing use does not give the word good faith their ordinary meaning. Stating that good faith is a mental state and the concept of good faith entails the possibility of a potentially undesirable result that is excusable. And the Court held that the good faith element refers to the intent of the actor as opposed to the effect, and asked the Ninth Circuit Court to distinguish between intent and effect, since it felt that by focusing on the effect, it ignored the plain meaning of good faith, and in essence, negated the defense. Honestly, Your Honors, what we're looking at here is we went into this brokering business in good faith. We worked closely with many of the franchise Lexus dealers. We received web hosting services from Toyota's agent, the Cobalt Group. Toyota, their franchise Lexus dealers, the consumers, Fast Imports, we all benefited from the use of the domain name FireLeaseLexus.com. And we're just here to ask, we don't understand where the harm is. If we're looking at confusion of the consumer and we're looking at the consumer being harmed by this, we're unsure where the confusion and the harm lies. Do you want to save the rest of your time for rebuttal? I'm sorry? Do you want to save the rest of your time for rebuttal? If I could, thank you. Okay. You've got 3 minutes and 21 seconds for rebuttal. We'll hear from opposing counsel. Good morning, Your Honor. Jens Kepke, Agranis Martin, appearing for Capelli. I think that first we have to remember that a domain name, which is what we have involved here, is a source identifier. So we have a... So what? So what? Because the so what is that? If you're in the nominative fair use field, which is where we are, by definition, you have to use the domain identifier. New kids, cans, beanie babies, it's all, by definition, you are, you know, you can't get away from it. We said that the sleek craft analysis doesn't apply. District Court applies sleek craft. Why isn't that simply an error of law and requiring reversal? I think, first of all, in cans, we didn't have a domain name usage. So what? We said sleek craft doesn't apply. In new kids, we said you can use the trademark. How else are these folks going to tell the public that they're in the business of providing sales and lease services for Toyota? I'm sorry, for Lexuses. Well, like any other business, you develop brand recognition around the business name. Well, that would have been the answer in Volkswagen as well. It would have been the answer in Chanel. Well, in the, what is the Chanel case? You know it. In, you know the case I'm talking about, involving Chanel No. 5. Well, as in, for example, in Volkswagen, I don't want to interrupt, Your Honor, if you're, but if, in Volkswagen, again, you had an example of a case that is pre-Internet, that goes back to the 1960s, where the risk of. Smith versus Chanel, Inc. Okay. In Volkswagen, you had a situation where you're talking about pre-Internet, where the risk of initial interest confusion is a completely different ballgame. And the other thing about Volkswagen, which is very importantly different from this case, you had a user that went to great efforts to make it clear that they were independent, disaffiliated from the market. I don't know what you can do any more than say what they say here, which is we are not an authorized Lexus dealer or affiliated in any way with Lexus. So as soon as you go to the Web page, the first thing you see, the first thing your eyes fall on is this disclaimer. We are an independent auto broker. Two things, Your Honor. One, that happens after you've already gone to the Web site. So the whole idea behind initial interest confusion in the domain area. So you haven't bought anything by going to the Web site. Going to the Web site is when you start shopping. And the first thing you follow before you spend any money, before you do anything at all, any interacting with them, you go to the Web site, and they say, we are not Lexus. If you are interested in dealing directly with, officially with Lexus, go somewhere else. Go away. First of all, number one, the idea behind initial interest domain name confusion is that that initial misdirection. The Brookfield case did the same thing. An initial misdirection says that you have hijacked someone else's mark. We don't know what the next click of a consumer is. How exactly do you apply nominative use to a domain name in your judgment? Well, it says, we are not Lexus.com. Well, that would be a very different situation. If you have a domain name that positively. You don't think I know that this is a very different situation? And how does that different situation come out? The reason it's different is because. How I realize it's different. You don't have to persuade me it's different. I have poses a hypothetical understanding that it's different. OK. OK. Do you understand that? Are we on the same page? We're on the same page. And how is a different case decided under your in your universe? What's different? No, no. I don't want you to tell me what's different about it. I want you to tell me how it is decided. You can answer the question. I can say I refuse to answer and move to something else. OK. It will likely. Do one of those two things. It will likely be found either not like that. We likely found that there is no lack of confusion or that there is a non-interference. And why that one and not this one? Because on its face. And again, we don't have to draw the line here today. But on its face, there's a good chance that that that there's a disaffiliation in that domain name from. But they're not selling. Your client doesn't sell websites. Your client sells cars. Exactly. They don't sell websites. They sell cars. And the website is buy or lease a Lexus dot com. And what we do is we sell Lexuses and we lease Lexuses. So and we finance Lexuses. So to any normal consumer, it's very possible there's confusion there. And so that is an example of an issue. So in your view, anything that suggests that they are in the business of brokering sales and leases of a trademark product, it simply can't be in a website. That's an absolute rule as far as you're concerned. And in particular, if you add in the fact that you have to take this case on its face, Your Honor, and this case also includes evidence. You know, why are you so difficult about answering the questions I ask you? I'm not trying to evade your answers. But I think he looks to me like you are. Okay. Okay, I ask the question and you want to tell me why the answer is not relevant or it doesn't matter. How about we just have this under the standard? I ask the question. You answer the question. Fine. Can we have that agreement? Absolutely. Absolutely. Okay. So in your view, does any website that tells people that they are in the business of selling or leasing a trademark product and uses the trademark in the website name, that is, per se, not nominative fair use? Yes, it enters the danger zone. We have to look at the three factors, wouldn't we, of the nominative fair use to make that decision finally. The district court didn't here. The district court looked at all three. Yes, the district court did look at all three of the nominative use. Show me where. I thought the district court applied Sleecraft. No, it also looked at nominative fair use. In the findings, Your Honor, let me apologize for the delay. It's okay. It's in the findings. It's 234. ER 234. What page of the district court's order? 28. Starts at 28 through 32. And the court looked at all of the elements of, Your Honors, New Kids. I'm sorry. Where does the district court actually apply those factors? On page 29. Defends or align the nominative fair use defense. The following elements. It describes the elements. All right. They have not met their burden of establishing this defense on page 30. They have not shown that their automobile brokerage business cannot be readily identified without using the mark Lexus. And it goes on. So the district court looked at this and, in fact, made findings that the defendant had not carried its burden of showing that the nominative use factors were met here. We have used de novo, right? Huh? We have your application of the fair use defense de novo, right? You do. And I can tell you why I think the district court was correct, Your Honor, in applying those factors. Because they could have used, identified their business and conducted their business without using the Lexus mark in the way they did, which not only included the domain name, but also using it, using the fonts on the Web site, using the. But it's no longer there. By the time of trial, they changed the font and they changed. There are no logos. It's not. The record's unclear about whether that happened by the time it was tried, Your Honor. But it was. But it was. It was. For most of the years of the business and most of the years of the sales for fast imports, there was no disclaimer. And the fonts were still on the Web site. So. And secondly, they. So you say it's unclear. There is a version of the. There is a version of the Web site in the record that shows this claim and doesn't use any fonts at all, as best I can say. Exactly. And it's undated, Your Honor. It's a defendant's exhibit. It's undated. Well, the evidence. They said the only evidence in the record is that they made some changes to the Web site in July 2005. And at least. Four years ago. Yes. But in this case, the lawsuit was filed in 2003, Your Honor. And it was tried in 2006. So when you say it's unclear, and I answer to my question by the time of trial, you really weren't entirely forthright because. I said that in time. By time, it was by most of the business that had. No, but actually by the time of trial, you said it's unclear. But now you're telling me that by the time of trial, a year before trial, they did change it. So you must have misspoke. It was tried in 2005, Your Honor. In August 2005. And this was changed in July. We don't know exactly, Your Honor. By July, you got. In July, you had testimony that some changes were made. It's really unclear. I'm sorry. I wish I could clear up the record, but it's not clear in the record. Well, what I heard you say is that this version of the website that appears with a disclaimer that they provided you this in July 2005. This was an exhibit that was put in a trial in August. So we don't know when it was printed. Presumably. It presumably was not printed after August. I mean, you know, they probably don't have future technology like that. Yes, I understand, Your Honor. And if we look at the second element, you know, did they use more than was necessary? And the answer is yes. How is that possible? How is that possible? If they want to communicate the fact that they're brokering Lexus cars, when they use simply the word Lexus in their domain name, what less can they use? Well, for number one, they don't have to use Lexus in their domain name. They're playing out of Lexus. They didn't have to use New Kids in the survey, New Kids. They didn't have to use Chanel No. 5 in the Chanel No. 5 case. They didn't have to use Volkswagen. They could just say we have German cars that, you know, there are only that many German car manufacturers, right? You know, there are all sorts of ways of describing things in all those cases. In all those cases, we held that they weren't entitled to actually use the mark. And none of those were domain name cases. And so in a domain name situation where the theory is initial interest confusion, the courts have been very clear. And the Papara case says you really can't have a fair use in a domain name situation. I'm sorry. Explain this to me. You're driving down the street and you see a sign saying we fix for Volkswagens. How is that not initial interest confusion? If you don't see that, you don't turn in. You have to go in and find out they're not an actual dealer. So how is this different from Volkswagens? Because that sign said independent, un-affiliated, independent Volkswagen repair shop. So yes, the initial interest, the initial impact is, well, this is an independent entity. And we don't have that here. We have the opposite. We don't have attempts to positively disassociate ourselves from Lexis. We have attempts to essentially associate ourselves with Lexis. That's the difference. And it's important. And it's even worse. The injunction in this case precludes them from using Lexis in any domain name whatsoever. Even they call it independentlexisbroker.com would be prohibited by the injunction. Is that right? Or we are not affiliated with Lexis in any way whatsoever.com would also be covered by the injunction. I'm asking a fraction of question about what you think the injunction provides. So tell me. The injunction bans the use of the ---- Did you hear my question? I did. Is it capable of a yes or no answer? It would likely ban that usage, yes. Okay. So it's too broad, isn't it, even by what you've admitted to me today? Because you, according to what you've said, is that they said we are not affiliated with Lexis. That would be fair use. That's what I heard you say. I don't have the injunction in front of my mind to know whether it's also said whether, but I don't know. That's okay. You've got the injunction. We'll give you a little more time. Okay. I guess I want to ask you one question before you go down, which you might look at as well. I was interested by a question you answered, Judge. It was my understanding that we had a district court trial here. Yes. It was my understanding that after the district court trial, the district court fashioned its findings of fact, conclusions of law, after that trial. Yes. And we're talking about fair use and how the district court found or did not find fair use. And I understood that you answered his question that fair use would be a de novo review after that trial. Again, this Court has spoken directly about copyright law in terms of de novo review and trademark. It has not spoken completely clearly about what the standard review is in trademark fair use arena. But we assume that it would probably be the same in trademark. Which is de novo, right? Which is de novo. Now, let me just, do you have the district court's order there, page 35? Yes. So I found it. So it's at the bottom. It's lines 23 through 28. You have to admit, do you not, that this is too broad, that this would cover even we are not Lexus in any way whatsoever.com. We are disassociate ourselves from Lexus.com. Lexus is not us.com. All of those things would be brought by the district court's injunction. As it is written there, it's not happening in front of you in black and white. Right? I think that's correct. Clearly, that's not the website they were using, Your Honor. We can agree on that. That's not the website that we're deciding about today. We are not Lexus.com. Why are you saying this? You think I think those are their website? No. You think I'm that confused about what they chose? Not at all, Your Honor. Not at all. Okay. Are you trying to avoid my question? I would love to answer it. I'm going to ask it one more time. Okay. And you can answer it or not. If you don't want to answer it, just sit down. I won't hold it against you. I might hold it against your client, but you'll be okay with me. Any of the things I've given you, we are not Lexus.com, and the like, would be covered by the injunction and prohibited. Yes or no? Yes, they would. And that's too broad, is it not? If one assumes that those No. According to the position you've taken today. Nice. According to what you have said today about institutional interest confusion, about the Volkswagen case and the things you specifically said about domain names, this is overbroad, is it not? Is it or is it not? Yes or no? It's capable of an answer, yes or no. You can then explain to me your answer. I'll give you a minute and a half to do that. But just start with a yes or no. It likely is, Your Honor. It would depend on precisely what website, domain name that you're talking about. I told you the ones I'm talking about. We are not Lexus.com. That would be overbroad. The injunction covers it. It's not allowed to, even by your own concession. So at the very least, we have to reverse vacate the injunction and, at the very least, order a narrow injunction. Is it not the case? Probably, Your Honor. Thank you. And I have one further question. If, in fact, our case law suggests that the sleek craft factors are not something that the district court should have used in this particular case, and they did, how can I not suggest that that is an abuse? I'm not sure that the – I guess I'm not – I don't agree that the sleek craft factors don't apply here. Why? Well, read Kearns. You got Kearns in front of you? I was going to say read him. Oh, well, let me give you my copy. Here, come here. Come here. I mean, my worry is – I'm serious. Come here. I'm going to talk to Judge Smith, Judge Kearns, take my book. You know, I'm willing to bet you know what Kearns says by heart, but go ahead. It's a little surprising that a lawyer doesn't know a key case like that. But anyway, Judge Smith, we're asking a question. I mean, that is the question that was truthfully on my mind when I walked in here, because I have a standard to review. I have a bench trial. I'm liable to give an old district judge a lot of room on a bench trial, me having been one. And now he applies factors which I believed – I mean, I think you've got three up here. I think he applies factors which that case says he shouldn't have applied. So I'm trying to figure out – now, I saw a fair use in there, but I'm trying to figure out if, in fact, he applied the wrong standard in making his determination, why that's not an abuse. That's my real worry here, because otherwise I can give the district judge a lot of territory. I think two things. One, again, at Kearns, we don't have a domain name situation. And I think there is an important distinction there, because the initial interest confusion context means that you need to first make the determination about whether there is a likelihood of confusion, and then you can determine whether or not there's an omnibus of fair use. I see that there's a distinction between the domain name situation and the Kearns situation. We don't have a domain name, because of this unique characteristic of the Internet and the ability of people to be misdirected and confused. Where do I find that case, or am I going to make up that law? I mean, I'm just trying to find. I've got this in front of me. I've got to now make the decision. Where do I find what law to apply if I look at this? I think if we – if – I think if you look, for example, at the Picard case. Okay. That was an example where the Court did look at the factors. I'm sorry. Which case? Picard. P-A-C-C-A-R. Peterbilt. Picard. Kenworth case. Yes. Where the Court did look at the sleek – at their version of the sleek craft factors and then considered the nominative fair use and considered them to be, you know, separate burdens. Our circuit doesn't have my case in front of it. No. It's a third circuit. It's a third. Yeah. What do they know? The nominative fair use was born right here. What do they know about it? But we can't – we can't really follow the circuit law when Judge Preggers and Reidy and Cairns tells us sleek craft doesn't apply. I mean, they may do it different in the circuit, but in our circuit, sleek craft just doesn't apply. And I – Six. Six. The other – the other point, I guess, I would be is – You're not going to look at the case. Can I have my book back? Absolutely. Are you going to look at it, Cairns? Do you want to look at it? I did look at it, Your Honor. I obviously don't have time to study it in depth while I'm sitting up here, so. We usually expect counsels to study these things in depth before they walk into court. And the other thought, Your Honor, is that even if sleek craft were inappropriately applied here, I don't see there being any prejudice because the burdens are separate in terms of proving the likelihood of confusion versus proving a nominative fair use. So one way or the other, the defendants would have to show the elements of nominative fair use. Well, but they have – really, the nominative fair use is an affirmative defense, isn't it? Yes. And therefore, they have a burden. I guess I've got to have a claim first that somebody proves. Well, if you – I mean, I can't just say, well, you didn't prove your affirmative defense, so therefore, the other side wins. I've got to have a claim that wins. And that was my worry. I mean, I wanted to talk to you about that because it seems to me that what you must prove or what you must do or what standard I must use in determining if the district court met the abuse standard, I mean, the best I can come up with is confusingly similar to a valid protectable trademark, but I don't find anything to get there. Well, if you take Kans at face value and say that you don't have to consider the sleek craft factors in order to – in a nominative fair use case, I don't think that means that the burden shifts to the plaintiff to have to carry the burden on nominative fair use, if that's what you're going to – And so I guess I'm – so if you take sleek craft out of the picture, the defendant still has to show nominative fair use and have the burden of that, and those elements are, you know, are separate and different from the sleek craft factors. And so the fact that sleek craft determinations were made here – Maybe it's best if we give the district court a tutorial and ask her to do it over, huh? Just tell her how it's done. Maybe she can get it right. Don't you think that would be the wiser course? No, Your Honor. I don't, because I think that the – first of all, I think that as a matter of law, the nominative fair use doesn't apply here. And secondly, even if – I'm sorry. How do you think it doesn't apply? Because, number one, it wasn't necessary to use the Lexis mark in as many of the different ways as the defendants did. Two, they used more of that mark than was necessary. And three, by the way they did it, they did create a confusion, a blurring of what the sponsorship was. Because – I'm sorry. When you say more than necessary, you mean they used more than – they used all four letters? No, they used it in ways – in other words, they did – they used it in a way that created a confusion as to who they were dealing with. In other words, your examples that you gave me would be an example where someone used it in a way that was clearly intended, meant, and operated to disaffiliate someone from that. And then you can have maybe a nominative fair use. But here we don't have that. So as a matter of law, it's nominative fair use. Thank you. Thank you, Your Honor. You've got three minutes and 21 seconds if you wish to use it. I will speak quickly. I just wanted to state a couple of things that had come up. Number one, with the disclaimer. He stated that once you get to the website, that's when you see the disclaimer. But to the contrary, let's assume someone goes on to the website and they type in www.buyerreleaselexus.com, they get to the website, there's the disclaimer. But if someone is simply just searching for Buyer Release Lexus on the actual search engine, it, too, states fast imports. We are not affiliated in a copy of that, too. Well, what happens if you go to a search engine and you type in Lexus? It does not appear in the search engine. I testified, Your Honor, that I personally searched through dozens of pages and was never able to find it myself. So what about those meta tags that you had? The meta tags that we had entailed in the very end we added one that was Lexus broker. But other than that, there wasn't any that had to do with strictly Lexus. So Lexus was not one of the meta tags? No, Lexus broker was. Okay, just answer my question. No. So this testimony, you testified that if you put in Lexus into a search engine, just Lexus, if you went to Yahoo, Google, one of those, and you put in Lexus, your domain wouldn't show up or your website wouldn't show up? Correct. What I testified was that if I looked on numerous pages, I wasn't able to find myself. Was it contrary testimony from anybody? No. And if I could just make one point. You represented yourself at trial, too? Yes. I know, foolish. I apologize. It's your right. I'm just asking a question. Yes, we did. These are very complicated things, and lawyers go to law school for a reason. But I'm not giving you advice. I'm just saying. It would have been wonderful had we been able to afford counsel, absolutely. If I could just make one more brief little point. I know my time is going. But you had questioned whether or not the website was changed before. We actually changed the website once in April 2002. Okay. You're not a lawyer, so let me just quickly explain it to you. You can't tell me anything that you know in your head unless it was presented to the district court below. So if you know the answer to a question, you know, because you are, you know, is this what you're about to tell me, something that was given to the district court, was presented to the district court? Yeah, I testified to that, Your Honor. Then go right ahead. Okay, yes. I testified that we, prior to receiving the complaint, prior to it actually being filed, the website was changed. And, again, that's why we relied on the Volkswagen case. And was Mr. Krapke there at trial when he testified like that? No, Your Honor. It was a different attorney. Is there a transcript of your testimony? Yes, there is. The April. Probably Mr. Krapke overlooked it. Okay. Okay. And then. Go ahead. I just wanted to touch base with very quickly that the district court in her findings of fact did state that a domain name often functions as an indication of origin and that the court goes on stating that thus the mere use of Lexis in a domain name generally implies sponsorship or endorsement. And I think that's what we're here, Your Honors, to do. Let me ask you a slightly different question. And, again, I'm only asking about things that happened in this case. Okay. So if you know the answer but it's not in the case, I don't want you to tell me, okay? I'll do my best. Yes. That's one of the things lawyers do. They keep these things compartmentalized. Okay. Is there any, as far as this record concerns, any claim that what you are doing, not the website or anything else, violates any law or in any way is, in any way unlawful insofar as the service you're providing violates, causes dealers to violate their contract with Toyota or anything of that sort? No, Your Honor. Was there any claim like this in this lawsuit? No, Your Honor. I mean, I know it didn't come to trial, but there was nothing like that. No, Your Honor. Okay. Thank you. All right. Thank you. Thank you very much. Thank you. The case is argued. We'll stand some minutes.
judges: Kozinski, Fernandez, Smith N. R.